UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
IN RE: ANTONIO LUCAS,           )
                                )
          Debtor.               )
_____)
                                )
DARRYL CHIMKO,                  )
                                )
          Appellant,            )
                                )
     v.                         )   CIVIL ACTION
                                )   NO. 03-40277-WGY
ANTONIO LUCAS,                  )
                                )
          Appellee.             )
                                )
_____)
```

MEMORANDUM AND ORDER

YOUNG, C.J.                                    September 30, 2004

## I.   INTRODUCTION

Michigan attorney Darryl Chimko ("Chimko") appeals from an order (the "Order") of the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") imposing sanctions for his misleading communications and unauthorized practice of law in Massachusetts. Chimko challenges the Order on two grounds, arguing that his communications with the Bankruptcy Court and a pro se debtor were not misleading and that his actions, which included mailing, completing, and filing a reaffirmation agreement, did not constitute the practice of law.

## II.  BACKGROUND

### A.  Factual Background

The following facts are essentially undisputed.  On April 17, 2003, debtor Antonio Lucas ("Lucas") filed a pro se petition for Chapter 7 bankruptcy relief.  Mem. of Decision [R. Item No. 15] at 1.  Listed on Lucas's schedule were his residence in Lawrence, Massachusetts, and the three mortgages that encumber the property: Fleet Bank with a balance of $14,000, Principle Residential with a balance of $37,900, and Household Finance with a balance of $23,700.  Id.

Chimko, a Michigan attorney acting on Household Finance's behalf, contacted Lucas by mail regarding reaffirmation of his debt.[1]  Id. at 1-3.  Chimko sent Lucas documents including a cover letter dated May 12, 2002,[2] a proposed reaffirmation agreement, a "reaffirmation data sheet," and a "notice of pro se reaffirmation."  2 Appellant's App. [Doc. No. 7] at AA 025.  The cover letter, like all future correspondence with Lucas, was

_____

[1] Briefly, reaffirmation of a debt waives the protections of bankruptcy.  See 4 Collier on Bankruptcy (15th ed. rev. 2004) (1979) ¶ 524.04.  Individuals such as Lucas, whose liabilities include a secured consumer debt, may choose to reaffirm the debt rather than surrender the collateral that secures it.  See 11 U.S.C. § 521(2)(A).

[2] Because the cover letter refers to Lucas's bankruptcy case, which was initiated on April 17, 2003, the Court presumes that the printed date, "May 12, 2002," was a typographical error.

2

printed on the letterhead of Chimko's law firm, which appeared as
follows:

**SHERMETA, CHIMKO & ADAMS, P.C.**
**Attorneys and Counselors at Law**
445 South Livernois Suite 333
P.O. Box 80490
Rochester Hills, MI 48308-0490
(248) 652-2000
Fax (248) 652-2896

Id.; Mem. of Decision at 2-3.  The letter identified Household
Finance as "Our Client," described the terms of the reaffirmation
agreement, and was signed "SHERMETA, CHIMKO & ADAMS, P.C."  2
Appellant's App. at AA 025.  The law firm advised Lucas that "we
cannot give you legal advice," but encouraged him to contact
**"DARRYL J. CHIMKO"** with "any questions or concerns."  Id.

The proposed reaffirmation agreement incorporated the
original terms of the Household Finance mortgage.  See
Appellant's Br. at 22.  Chimko entered these terms, unchanged,
into a form substantially similar to Official Bankruptcy Form 6.
Id.; 7/31/03 Show Cause Hr'g Tr. [R. Item No. 9] at 15:4-10,
37:3-10.  Chimko's form, however, differed in at least three
respects: its "Notice to Debtor" was emphasized by bold as well
as underlined text, it was signed by Chimko as "Agent for
Creditor" rather than as "Creditor Representative," and it was
shorter -- two pages rather than six.  See 7/31/03 Show Cause
Hr'g Tr. at 37:12-38:15; compare 1 Appellant's App. [Doc. No. 6]
at A 036-037, with Official Bankruptcy Form 6.  Chimko testified

3

that each of these changes was approved by corporate counsel for Household Financial.  7/31/03 Show Cause Hr'g Tr. at 15:11-18.

The enclosed "reaffirmation data sheet" called for Lucas to provide his address and phone number, the name, address, and phone number of his employer, and his monthly net income.  Letter from Brennan to the Court of 3/4/04, Ex. A.  The intended "notice of reaffirmation," which Chimko captioned as a pleading but included for Chimko's reference, informed the Court that the debtor had reaffirmed a debt secured by real property.  1 Appellant's App. at A 038.  The notice began: "**NOW COMES**, Creditor, HOUSEHOLD FINANCE CORPORATION II, by and through its attorneys, SHERMETA, CHIMKO & ADAMS, P.C." Id.  In its penultimate paragraph, the notice requested that the Bankruptcy Court "advise Creditor of any Hearing on the attached Reaffirmation Agreement by notifying agent for Creditor . . . , **Attention: DARRYL J. CHIMKO**." Id. ¶ 7.  The notice concluded:

> If Creditor is not notified of any Hearing on
> Reaffirmation concerning the attached Reaffirmation
> Agreement, Creditor shall proceed in a manner
> consistent with the plain language of the aforestated
> statute [11 U.S.C. § 524] and shall consider the
> attached Reaffirmation Agreement to be valid, so long
> as all other requirements to obtain a valid
> Reaffirmation Agreement are present under 11 U.S.C. §
> 524.

Id. ¶ 8.  Chimko signed the notice on behalf of "SHERMETA, CHIMKO & ADAMS, P.C.[,] . . . Agent for Creditor."  1 Appellant's App. at A 038.

By letter dated May 27, 2003,[3] the bankruptcy department of Chimko's law firm advised Lucas that they had not received the executed reaffirmation agreement.  Mem. of Decision at 3-4.  Like the initial cover letter, this letter was printed on law firm letterhead and identified Household Finance as "Our Client."  2 Appellant's App. at AA026.  On June 2, 2003, Lucas executed the reaffirmation agreement, which Chimko then signed on behalf of Shermeta, Chimko & Adams, P.C., "Agent for Creditor."  1 Appellant's App. at A037.

Chimko filed the executed reaffirmation agreement with the Bankruptcy Court on June 16, 2003.  Mem. of Decision at 2.  Enclosed with the agreement were a cover letter and the notice of reaffirmation described above.  Id.; 1 Appellant's App. at A 039.  The cover letter, like those previously sent to Lucas, was printed on law firm letterhead and signed by Chimko on behalf of "Shermeta, Chimko & Adams P.C."  1 Appellant's App. at A 039.

**B.  Procedural Posture**

The Bankruptcy Court, noting that Chimko had entered an appearance as an "agent" but submitted the notice of reaffirmation as an "attorney[]," ordered Chimko to appear at a hearing that would take place on July 31, 2003.  See Mem. of

---

[3] The Bankruptcy Court actually gives the date as "May 27, 2002," but this reflects a typographical error either in the Memorandum of Decision or in the original letter, as it was clearly sent in 2003.

Decision at 2.  There, counsel for Chimko argued that preparing
and filing the reaffirmation agreement was merely "ministerial":
"It's something that could be performed by someone who doesn't
happen to be an attorney, and I know from my own experience that
some of the other large companies handle these things in-house."
7/31/03 Show Cause Hr'g Tr. at 54:16-20.  The United States
Trustee ("Trustee") disagreed.  Id. at 58:16-59:6.  The Trustee
noted that Chimko had revised Local Form 6, signed the
reaffirmation agreement, and drafted the accompanying notice,
tasks which "other firms . . . hire local counsel to do . . for a
good reason."  Id. at 58:16-59:6.  The Bankruptcy Court,
concurring with the Trustee, later ordered Chimko to identify all
cases pending in the District of Massachusetts in which he or his
law firm had filed a reaffirmation agreement or an appearance.
Id. at 59:7-11; Order of 8/4/03 [R. Item No. 11].

The Bankruptcy Court issued its decision on October 10,
2003.  [R. Item No. 14].  The accompanying memorandum explained
that Chimko, in preparing the reaffirmation agreement, providing
Lucas with the notice of reaffirmation, and printing
correspondence on law firm letterhead, had misrepresented his
status to Lucas and the Bankruptcy Court, and engaged in the
unauthorized practice of law in Massachusetts.  Mem. of Decision
at 3-6.  In addition, the Bankruptcy Court determined that Chimko
had "never fully complied" with the order to identify his cases

6

pending before the District of Massachusetts. <u>Id.</u> at 6.  In fact, Chimko had omitted nine such cases, three of which listed Chimko or his law firm as "agents." <u>Id.</u> at 6, Attach.  As a remedy for Chimko's actions, the Bankruptcy Court sanctioned Chimko in the amount of $500, and forwarded copies of its decision to the Massachusetts Board of Bar Overseers and the Michigan Attorney Discipline Board. <u>Id.</u> at 7.

On Chimko's motion for reconsideration, the Bankruptcy Court revised its findings to recognize that Chimko had provided a satisfactory explanation -- namely errors in his law firm's records -- for his omission of certain pending cases. Decision & Order of 10/31/03 [R. Item No. 19] ¶ 2.  The Bankruptcy Court stated, however, that Chimko's "compliance or non-compliance with the Court's Order is not material to the Court's conclusion that he held himself out as an attorney without being licensed by this Commonwealth." <u>Id.</u> ¶ 3.

Chimko appealed the decision to this Court by notice and election dated November 10, 2003. <u>See</u> Notice of Appeal [R. Item No. 20]; Election of Appeal [R. Item No. 21].  Neither Lucas, the Trustee, nor any other party submitted briefs in opposition.  On February 12, 2004, after hearing oral argument, the Court affirmed the Bankruptcy Court's decision as to misrepresentation. <u>See</u> 2/12/04 Hr'g Tr. at 5:21-23.  As to unauthorized practice, however, the Court found state policies less clear. <u>Id.</u> at 4:23-

5:5.  The Court accordingly invited supplemental briefing on both

substance and procedure.  Specifically, the Court inquired

whether Chimko's actions constituted the unauthorized practice of

law, and whether the question ought be certified to the Supreme

Judicial Court of Massachusetts.  See 2/12/04 Hr'g Tr. at 10:5-

11:2.  Having since received Chimko's[4] supplemental memorandum,

the Court proceeds to decide the appeal.

**III. DISCUSSION**

    **A.  Jurisdiction**

    As an initial matter, it is unclear that Chimko in fact

challenged a "final Order" when filing his notice of appeal.  See

Appellant's Br. at 2.  If extended to appeals in bankruptcy, the

Supreme Court's opinion in Cunnigham v. Hamilton County, Ohio,

527 U.S. 198 (1999), suggests otherwise.  In Cunningham, the

Supreme Court held that an order of sanctions, even if imposed on

an attorney who no longer represents a party to the case, is not

a "final decision" from which an immediate appeal will lie.  Id.

at 200; see also Empresas Omajede, Inc. v. Bennazar-Zequeira, 213

F.3d 6, 9 & n.4 (1st Cir. 2000) (suggesting that Cunningham may

---

    [4] The Massachusetts Board of Bar Overseers, Michigan
Attorney Discipline Board, and Consumer Protection and Antitrust
Division of the Massachusetts Office of the Attorney General were
invited to submit briefs as amici curiae but declined to do so.
See 2/12/04 Hr'g Tr. at 10:5-17; Order of 3/10/04 [Doc. No. 9];
Letter from Carpenter and Crane to the Court of 4/6/04.

extend to sanctions orders issued by bankruptcy courts); In re Rimsat, Ltd., 212 F.3d 1039, 1044 (7th Cir. 2000) (same).

Yet even if not formerly so, the decision of the Bankruptcy Court has since become final. On November 18, 2003, the Bankruptcy Court issued an order discharging Lucas. Docket Rpt. [R. Item No. 1], Doc. No. 27. Under the doctrine of cumulative finality, this subsequent event "saved" Chimko's appeal, see Rimsat, 212 F.3d at 1044, permitting Chimko to seek review "as of right" rather than "by leave," Fed. R. Bankr. P. 8001. See 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3926.2.

**B.   Standard of Review**[5]

On appeal, this Court applies a "clearly erroneous" standard to the bankruptcy court's findings of fact, giving "due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013. Mixed

---

[5] As the First Circuit has recently explained, an order for sanctions may lack finality, and therefore warrant no deference, if the disciplinary proceedings before the bankruptcy court were "non-core," -- that is, not "essential to the administration of the bankruptcy estate." See In re Sheridan, 362 F.3d 96, 100, 107 (1st Cir. 2004). Here, however, in contrast to Sheridan, sanctions were imposed during an ongoing bankruptcy proceeding, and the sanctioned attorney both failed to raise the core/non-core issue and affirmatively characterized the Order as "final," Appellant's Br. at 2. See Sheridan, 362 F.3d at 103-04, 111. The Court thus considers the decision of the Bankruptcy Court a final order, subject to the deferential standard of review outlined in section III.B.

questions of law and fact ordinarily are also reviewed under the "clearly erroneous" standard, "unless the bankruptcy court's analysis was 'infected by legal error.'" <u>In Winthrop Old Farm Nurseries, Inc.</u>, 50 F.3d 72, 73 (1st Cir. 1995) (quoting <u>Williams v. Poulos</u>, 11 F.3d 271, 278 (1st Cir. 1993)). Conclusions of law, in contrast, are reviewed <u>de novo</u>. <u>In re LaRoche</u>, 969 F.2d 1299, 1301 (1st Cir. 1992).

### C.    Misleading Communications

Although the "rules regulating attorney conduct in federal court are strictly a matter of federal law," <u>In re Sheridan</u>, 362 F.3d 96, 109 n.16 (1st Cir. 2004), federal law here incorporates state law, including the Massachusetts Rules of Professional Conduct. <u>See</u> Bankr. D. Mass. R. 2090-2(a) (holding attorneys who appear before the Bankruptcy Court -- defined to include attorneys who file "any pleading or other document," Bankr. D. Mass. R. 9010-3(a) -- to the standards of professional conduct set forth by this District); D. Mass. R. 83.6(4)(B) (defining the "ethical requirements and rules" of this District to mean "those canons and rules adopted by the Supreme Judicial Court of Massachusetts"). The Bankruptcy Court determined that Chimko violated Massachusetts Rules of Professional Conduct 7.1 ("Massachusetts Rule 7.1") and 7.5 ("Massachusetts Rule 7.5") "through his habitual correspondences with his firm's letterhead, admitted typographical error[, which identified Chimko's law firm

as "attorneys" for Household Finance], and repeated behavior in
committing these errors." Mem. of Decision at 6-7; see id. at 4.
Chimko protested that neither his law firm's letterhead nor his
notice of reaffirmation was "misleading." See Appellant's Br. at
25-29. The Court considered the communications in turn, mindful
that the interpretation of a bankruptcy court is subject to
"clearly erroneous" review "'if the writing is subject to more
than one reasonable interpretation,'[6] or if the court relies on
extrinsic evidence such as the parties' intent." In re Charlie
Auto Sales, Inc., 336 F.3d 34, 37 (1st Cir. 2003) (citation
omitted) (quoting Gel Systems, Inc. v. Hyundai Engineering &
Construction Co., 902 F.2d 1024, 1027 (1st Cir. 1990)).

    As described above, each of Chimko's letters to Lucas and
the Bankruptcy Court was printed on the letterhead of Chimko's
law firm: "SHERMETA, CHIMKO & ADAMS, P.C. / Attorneys and
Counselors at Law." See Mem. of Decision at 4-5. The Bankruptcy
Court noted that this letterhead provided the "only indication of
Chimko's role," because "Chimko ma[de] no mention of his status
as 'agent.'" Id. at 4-5. In fact, the letters were also signed
in the name of Chimko's law firm, rather than his own. Id. at 5.
Lucas and the Bankruptcy Court thus "could easily be lead to

---

    [6] The Court notes, for example, that the notice of
reaffirmation identified Shermeta, Chimko & Adams, P.C. both as
"attorneys" and as "agent." See Appellant's App. at A 038. The
Bankruptcy Court's determination that the notice was misleading
as a whole was reviewed for clear error.

believe that Chimko was acting as an attorney with the support of
his firm." <u>Id.</u>  Chimko argued that the letters fell beyond the
category of "false advertising," with which he claimed the
Massachusetts Rules are primarily concerned.  Appellant's Br. at
26-27.  Moreover, Chimko maintained, the letters were not
misleading: they "did not make any representations regarding the
services to be provided to the Debtor," "did not contain any
threat," and did not induce reliance.  <u>Id.</u> at 26-27.

    Massachusetts Rule 7.5, "Firm Names and Letterheads,"
provides in relevant part:

> (a) A lawyer shall not use a firm name, letterhead, or
> other professional designation that violates Rule 7.1.
> . . .
>
> (b) A law firm with offices in more than one
> jurisdiction may use the same name in each
> jurisdiction, but identification of the lawyers in an
> office of the firm shall indicate the jurisdictional
> limitations on those not licensed to practice in the
> jurisdiction where the office is located.

Mass. R. Prof. C. 7.5.  Massachusetts Rule 7.5(a) thus
incorporates the standard set forth in Massachusetts Rule 7.1,
which prohibits false or misleading "Communications Concerning a
Lawyer's Services":

> A lawyer shall not make a false or misleading
> communication about the lawyer or the lawyer's
> services.  A communication is false or misleading if it
> contains a material misrepresentation of fact or law,
> or omits a fact necessary to make the statement
> considered as a whole not materially misleading.

Mass. R. Prof. C. 7.1.  These rules are thus not concerned solely
with "false advertising."  Appellant's Br. at 26-27.  Rather,
their scope is broad, "govern[ing] all communications about a
lawyer's services," Mass. R. Prof. C. 7.1 cmt. 1, including firm
letterheads, Mass. R. Prof. C. 7.5.  The rules thus recognize, as
the Bankruptcy Court did, that use of a law firm's letterhead is
itself a communication that "can easily mislead."  Mem. of
Decision at 5; <u>see</u> ABA/BNA Lawyers' Manual on Professional
Conduct 81:3001 ("The use of a lawyer's letterhead to send
communications to other parties is seen as a statement that the
lawyer is responsible for the fact and the content of the
communication."); <u>cf.</u> <u>Woods</u> v. <u>New York Life Ins. Co</u>., 686 F.2d
578, 581 (7th Cir. 1982) (deeming judicial letterhead unsuitable
for providing class action notice because it conveys "judicial
sponsorship" and "is likely to be misunderstood as a
representation that the suit probably has merit").  Chimko's
contentions regarding the text of the letters, Appellant's Br. at
26, were thus largely beside the point.  It was the letterhead,
not the letters, that the Bankruptcy Court found misleading.  <u>See</u>
Mem. of Decision at 4-5.

     That Massachusetts Rule 7.5 regulates letterheads generally
-- and not, as Chimko suggested, only when used to solicit
prospective clients, Appellant's Br. at 26 -- is consistent with
the "general orientation" of the Massachusetts Rules.  Mass. R.

Prof. C. Scope ¶ 9.  Because a lawyer is an "officer of the legal system" as well as a "representative of clients," Mass. R. Prof. C. Preamble, his responsibilities under the Massachusetts Rules extend to courts and third parties as well as to prospective clients.  See Mass. R. Prof. C. 3.3 ("Candor Toward the Tribunal"); Mass. R. Prof. C. 4.1 ("Truthfulness in Statements to Others"); see also Mass. R. Prof. C. Preamble ¶ 2 (requiring negotiating lawyers to observe "requirements of honest dealing with others").  Here, the Bankruptcy Court determined that both it and the third party debtor "could easily be lead to believe that Chimko was acting as an attorney with the support of his firm."  Mem. of Decision at 5.  The predictable effect of Chimko's letters was thus to pressure the pro se debtor into executing the reaffirmation agreement.  Chimko's reply, that Lucas never testified to being actually misled, Appellant's Br. at 26-27, was unpersuasive.  Like other rules governing presumptively harmful communications, Massachusetts Rules 7.1 and 7.5 are prophylactic, intended to prevent injury before it occurs.  Cf. Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 464 (1978) (describing the state interest behind similar rules in Ohio).  Accordingly, "regulation -- and imposition of discipline -- are permissible" here because the improper use of law firm letterhead has been deemed "inherently likely to deceive."  In re R. M. J., 455 U.S. 191, 202 (1982); see Mass. R. Prof. C. 7.5.

14

The Court thus discerned no clear error in the Bankruptcy Court's determination that "Chimko's use of the letterhead [wa]s a misrepresentation."  <u>See</u> Mem. of Decision at 5.

As to Chimko's notice of reaffirmation, the Bankruptcy Court emphasized that the opening paragraph identified Shermeta, Chimko & Adams, P.C. as "attorneys" for Household Finance.  <u>Id.</u> Although Chimko claimed this was merely a typographical error, the Bankruptcy Court discovered that others of Chimko's notices revealed the same oversight.  <u>Id.</u>  In addition, the Bankruptcy Court noted that Chimko provided notices only to pro se debtors, "exactly the kind of individual likely to believe that the Notice[,] which this Court read as containing information contrary to the Code, was an attorney's statement of what Debtor's mere signing of the reaffirmation obligated him to do." <u>Id.</u> at 5-6.  Chimko argued that the notice, while perhaps contrary to the Code, was as a whole consistent with local bankruptcy rules.  Appellant's Br. at 28.  For this reason, Chimko urged, "[i]t was clearly an erroneous finding to determine that the notice was misleading."  <u>Id.</u>

Chimko, however, failed to appreciate the Bankruptcy Court's chief concern: the misrepresentation of his status.  <u>See, e.g.</u>, Mem. of Decision at 6 ("Chimko appears to believe that his status as either an 'agent' or an 'attorney' makes no difference to the Debtor or the Court.  It is disturbing to think of potential

debtors who would be confused and intimidated by these 'typos' .

. . .").  Indeed, the Bankruptcy Court noted the inaccuracy of

the notice primarily -- if not solely -- because debtors were

likely to view it as "an attorney's statement."  Id. at 5-6.  It

was thus the introduction to the notice -- "NOW COMES, Creditor .

. . by and through its attorneys" -- rather than the notice

itself that the Bankruptcy Court deemed misleading.  And although

Chimko characterized the error as "unintentional," Appellant's

Br. at 29, the Bankruptcy Court found it to be it habitual: "The

troublesome fact that Chimko's pleadings have contained the same

'typo' in so many separate instances suggests that this was no

common oversight."  Mem. of Decision at 6.  The Bankruptcy

Court's determination that the notice further misrepresented

Chimko's status thus was not clearly erroneous.

    In sum, the Court discerned no clear error with regard to

Chimko's letters or his notice of reaffirmation.  The Bankruptcy

Court's conclusion that these communications violated

Massachusetts Rules 7.1 and 7.5 was accordingly affirmed.  See

2/12/04 Hr'g Tr. at 9:21-:23.

    **D.    Unauthorized Practice of Law**

    The Bankruptcy Court, interpreting Massachusetts standards,

determined that "all of [Chimko's] actions . . . involving the

Reaffirmation Agreement constitute[d] the practice of law."  Mem.

of Decision at 3.  Specifically, the Bankruptcy Court noted that

Chimko "prepared a Reaffirmation Agreement in which contractual rights were modified and created," "provided pro se debtors with a form of notice he believed would be of assistance to them in understanding the reaffirmation process," and corresponded with Lucas and the Court using law firm letterhead.  Mem. of Decision at 3.  Chimko challenges the Bankruptcy Court's conclusion on two grounds.  He contends that as a general matter, Massachusetts standards have no application to "administrative" practice before federal bankruptcy courts.  Appellant's Br. at 19-22.  He also asserts that the particular actions at issue do not amount to the practice of law: the reaffirmation agreement merely confirmed preexisting rights, the notice merely requested service, and the letter to the Bankruptcy Court merely directed its attention to the documents.  See id. at 22-24.

The Court first addresses Chimko's more general challenge -- that federal, not state, standards ought govern administrative practice before federal bankruptcy courts.  Chimko maintains that the relevant standard is set forth in Federal Rule of Bankruptcy Procedure 9010(a) ("Federal Rule 9010(a)"), which provides:

> A debtor, creditor, equity security holder, indenture trustee, committee or other party may (1) appear in a case under the Code and act either in the entity's own behalf or by an attorney authorized to practice in the court, and (2) perform any act not constituting the practice of law, by an authorized agent, attorney in fact, or proxy.

Fed. R. Bankr. P. 9010(a).  Relying heavily on <u>State Unauthorized</u> <u>Practice of Law Committee</u> v. <u>Paul Mason & Associates, Inc.</u>, 46 F.3d 469 (5th Cir. 1995), Chimko argues that Federal Rule 9010(a) invests nonlawyer agents with "explicit and general authority" that is independent -- and indeed preemptive -- of state limits on the practice of law.  Appellant's Br. at 21 (quoting <u>Paul</u> <u>Mason</u>, 46 F.3d at 471).  In <u>Paul Mason</u>, the Fifth Circuit concluded that a contrary interpretation would be inconsistent with Federal Rule of Bankruptcy Procedure 1001 ("Federal Rule 1001"), which directs that "[t]hese rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding," Fed. R. Bankr. P. 1001, and with <u>Sperry</u> v. <u>Florida ex rel. Florida Bar</u>, 373 U.S. 379 (1963), in which the Supreme Court held that the State of Florida could not enforce requirements that would deny nonlawyers their federally granted rights to practice before the Patent Office.  <u>See</u> <u>Paul Mason</u>, 46 F.3d at 471-72; Appellant's Mem. [Doc. No. 11] at 10-12; <u>see also</u> <u>In re Poole</u>, 222 F.3d 618, 623 (9th Cir. 2000) ("The trustee cannot employ a collateral attack based on state law to prevent Smith from practicing federal bankruptcy law in Arizona.").

The Court begins with the basic principles.  First, the "rules regulating attorney conduct in federal court are strictly a matter of federal law."  <u>Sheridan</u>, 362 F.3d at 109 n.16. Second, although federal legislation may displace state law,

courts "'start with the assumption that the historic police
powers of the States were not to be superseded by the Federal Act
unless that was the clear and manifest purpose of Congress.'"
Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (quoting Rice
v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)); see
Pacific Gas & Elec. Co. v. California ex rel. California Dep't of
Toxic Substances Control, 350 F.3d 932, 943 (9th Cir. 2003)
("[T]he presumption against displacing state law by federal
bankruptcy law is just as strong in bankruptcy as in other areas
of federal legislative power." (citing Midlantic National Bank
v. New Jersey Department of Environmental Protection, 474 U.S.
494, 501 (1986), and BFP v. Resolution Trust Corp., 511 U.S. 531,
544 (1994))).

Here, the governing federal law clearly contemplates
representation by nonlawyer agents.  In fact, the Paul Mason
court argued, the authority granted by Federal Rule 9010(a) is
sufficiently "explicit and general" to evidence Congress's intent
to supercede state law.  See Appellant's Br. at 21 (quoting Paul
Mason, 46 F.3d at 471).  Yet the express terms of the rule
indicate that its authorization is not unlimited; rather
nonlawyer agents may perform only those acts "not constituting
the practice of law."  Fed. R. Bankr. P. 9010(a).  This
limitation distinguishes Federal Rule 9010(a) from the
regulations at issue in Sperry, the decision on which Paul Mason

primarily relied.  See Paul Mason, 46 F.3d at 471.  In Sperry,

the Supreme Court interpreted federal regulations to grant

nonlawyers "unqualified" authority to practice before the Patent

Office.[7]  Sperry, 373 U.S. at 385.  Under these circumstances,

the Supreme Court declined to "read in . . .  the condition that

such practice not be inconsistent with state law."  Id.  Here, in

contrast, the limitation need not be "read in."  It is made plain

by the language of Bankruptcy Rule 9010(a).

        The question, then, is whether federal or state standards

ought define the "practice of law" limitation.  See United States

v. Kimbell Foods, Inc., 440 U.S. 715, 727-28 (1979)

("Controversies . . . governed by federal law[] do not inevitably

require resort to uniform federal rules.").  In thus framing the

question, the Court necessarily holds that state standards do not

directly conflict with federal rules.  Where it is otherwise --

that is, where state law is in "actual conflict" with federal law

-- state law of course must yield.  Sprietsma v. Mercury Marine,

---

        [7] The Supreme Court found additional support for its
interpretation in "the contrast with the regulations governing
practice before the Patent Office in trademark cases."  Sperry,
373 U.S. at 386.  Unlike the regulations governing patent cases,
the regulations governing trademark cases provided:
"[r]ecognition of any person under this section is not to be
construed as sanctioning or authorizing the performance of any
acts regarded in the jurisdiction where performed as the
unauthorized practice of law."  Sperry, 373 U.S. at 386 (quoting
37 C.F.R. § 2.12(d)) (alteration in original).  Federal Rule
9010(a), which similarly excludes "acts constituting the practice
of law," is distinguishable from the unqualified authorization of
Sperry on the same basis.

537 U.S. 51, 64 (2002).[8]  In re Desilets, 291 F.3d 925 (6th Cir.
2002), for example, involved a Texas attorney properly admitted
to practice before the United States District Court for the
Western District of Michigan.  Desilets, 291 F.3d at 927.
Because the district's local rules expressly entitled the
attorney to represent and counsel clients, Michigan's contrary
requirements did not apply: "When state licensing laws purport to
prohibit lawyers from doing that which federal law expressly
entitles them to do, the state law must give way."  Id. at 930
(citing Sperry, 373 U.S. at 385).

      Unlike the debtor's attorney in Desilets, Chimko was not
"expressly entitle[d]" to represent clients before the Bankruptcy
Court.  In general, to appear and practice before the Bankruptcy
Court, an attorney must be either "a member in good standing of
the bar of [the] United States District Court for the District of
Massachusetts," or a member of another bar who has sought and
obtained the leave of the Bankruptcy Court.  See Bankr. D. Mass.
R. 9010-1.  Chimko was neither.  See 7/31/03 Show Cause Hr'g Tr.
at 13:2-10.  Because Chimko was not "properly admitted to the

---

      [8] This case obviously does not involve "field preemption,"
where "the scope of a statute indicates that Congress intended
federal law to occupy a field exclusively." English v. General
Elec. Co., 496 U.S. 72, 78-79 (1990).  Likewise, it does not
involve express preemption.  For a discussion of "express,"
"conflict," and "field" preemption, see Pacific Gas & Electric
Co. v. State Energy Resources Conservation & Development
Commission, 461 U.S. 190, 203-04 (1983).

[relevant] federal bar," the federal rules are not in actual conflict with state restrictions.  Desilets, 291 F.3d at 931; see also In re Lyon, 301 Mass. 30, 35-36 (1938) ("[W]e see no reason why our policy or statute should give way in favor of persons who seek to escape State regulation of the practice of law on the ground that their practice is within the field of Federal jurisdiction, when they are not authorized to practise in that jurisdiction.").  The reasoning of Desilets thus does not apply. See In re Poole, 222 F.3d 618, 622 (9th Cir. 2000) (characterizing a decision of the Second Circuit as "completely inapposite" because the attorney involved in that case, unlike the attorney involved in Poole, "was not admitted to practice before the federal district court").  Accordingly, in the absence of an "actual conflict" that would preempt state standards, this Court may "giv[e] content" to Federal Rule 9010(a) either by "adopt[ing] state law" or by "fashion[ing] a nationwide federal rule."  Kimbell Foods, 440 U.S. at 727-29.

     The Court acknowledges at the outset that a number of scholars have urged federal regulation, at least of practice before federal courts, in response to the increasingly national nature of legal practice.  See, e.g., Stephen B. Burbank, State Ethical Codes and Federal Pratice: Emerging Conflicts and Suggestions for Reform, 19 Fordham Urb. L.J. 969, 978 (1992); Fred C. Zacharias, Federalizing Legal Ethics, 73 Tex. L. Rev.

335, 379 (1994); <u>see also</u> <u>Frazier</u> v. <u>Heebe</u>, 482 U.S. 641, 648 n.7 (1987) ("There is a growing body of specialized federal law and a more mobile federal bar, accompanied by an increased demand for specialized legal services regardless of state boundaries."). Congress, however, has not yet adopted a federal rule defining the "practice of law," nor has any relevant federal court promulgated such a rule.  <u>Frazier</u>, 482 U.S. 641, 646 n.4 (1987) ("Congress thus far has chosen to leave regulation of the federal bars to the courts."); <u>see</u> Fred C. Zacharias & Bruce A. Green, <u>Federal Court Authority to Regulate Lawyers: A Practice in Search of a Theory</u>, 56 Vand. L. Rev. 1303, 1373; <u>cf.</u> 28 U.S.C. § 530B (subjecting an attorney for the federal government not to uniform federal regulation, but to the "State laws and rules, and local Federal court rules, governing attorneys in each State").  Absent a congressionally enacted rule, "it is for the federal courts to fashion the governing rule of law according to their own standards."  <u>Clearfield Trust Co.</u> v. <u>United States</u>, 318 U.S. 363, 367 (1943).  As set forth in <u>Kimbell Foods</u>, these standards direct the Court to consider the need for uniformity, the likelihood that application of state law would frustrate specific federal objectives, and the extent to which application of a federal rule would disrupt commercial relationships predicated on state law.  <u>Kimbell Foods</u>, 440 U.S. at 728-29.

In "giving content" to Federal Rule 9010(a), <u>Kimbell Foods</u>, 440 U.S. at 727, the <u>Paul Mason</u> court determined that adopting state standards would frustrate the intent of Congress, as reflected in the legislative history and text of the Bankruptcy Reform Act of 1978, "to separate purely administrative functions from judicial ones" and "to secure just, speedy, and inexpensive determinations" of bankruptcy proceedings. <u>Paul Mason</u>, 46 F.3d at 471. This Court disagrees, for two reasons. First, the federal objectives do not appear as broad as Chimko and the Fifth Circuit suggest. Although the Bankruptcy Reform Act indeed separated administrative and judicial functions, it did so with respect to judges, not agents. <u>See</u> 1 <u>Collier on Bankruptcy</u>, <u>supra</u>, ¶ 1.01[3] (indicating that the functions were separated to "attract high caliber applicants to the judicial post" and to ensure that the "bankruptcy courts would be fair and unbiased"). In addition, although the Bankruptcy Code indeed seeks speedy and inexpensive determinations, it does not do so at all costs. For example, although the alternative likely would be speedier and less expensive, Federal Rule 9010(a) "does not purport to change prior holdings prohibiting a corporation from appearing pro se."[9]

---

[9] Local Bankruptcy Rule 9010-1(c) modifies the prohibition, permitting corporations to appear "through an officer or agent, or a person authorized by a power of attorney" when filing or objecting to a proof of claim or an application for payment of unclaimed monies. Bankr. D. Mass. R. 9010-1(c). In all other contexts, however, corporations "shall appear only through counsel." <u>Id.</u>

See Fed. R. Bankr. P. 9010(a) advisory committee note (citing In re Las Colinas Development Corp., 585 F.2d 7 (1st Cir. 1978), which declined a corporation's request to have its president represent it in bankruptcy proceedings, notwithstanding the corporation's assertion that it could not afford a lawyer).

Second, even if the federal objectives were as broad as the Fifth Circuit and Chimko suggest, it not clear that the application of Massachusetts law would frustrate them.  Like the Bankruptcy Reform Act, Massachusetts practice-of-law standards distinguish between administrative (or nonlegal) functions and judicial (or legal) ones.  See Lowell Bar Ass'n v. Loeb, 315 Mass. 176, 181 (1943) ("The proposition cannot be maintained, that whenever, for compensation, one person gives to another advice that involves some element of law, or performs for another some service that requires some knowledge of law, or drafts for another some document that has legal effect, he is practising law.").  Further, like the Bankruptcy Code, Massachusetts standards promote "just" determinations.  The standards "protect[] . . . the public from being advised and represented in legal matters by incompetent and unreliable persons, over whom the judicial department could exercise little control."  Id. at 180.

A more compelling -- if only indirectly articulated -- argument for fashioning a federal rule asserts a need for

uniformity.  See Appellant's Mem. at 12.  The Bankruptcy Clause
of Article I, after all, permits Congress to establish "uniform
Laws on the subject of Bankruptcies throughout the United
States."  U.S. Const. art. I, § 8; Pacific Gas & Electric, 350
F.3d at 943.  The authority to establish uniform federal laws,
however, does not necessarily displace state legislation.
Rather, "state laws are thus suspended only to the extent of
actual conflict" with the federal system.  Stellwagen v. Clum,
245 U.S. 605, 613 (1918); see also 1 Laurence H. Tribe, American
Constitutional Law 847 n.2 (3d ed. 2000) (1978) ("Nor does
congressional action necessarily preempt state legislation if the
state legislation is not in conflict with federal law.") (citing
Stellwagen, 245 U.S. at 615).  Absent "actual conflict," federal
bankruptcy rules "may recognize the laws of the state in certain
particulars," notwithstanding that "such recognition may lead to
different results in different states."  Stellwagen, 245 U.S. at
613; see Vanston Bondholders Protective Comm. v. Green, 329 U.S.
156, 172 (1946) (Frankfurter, J., concurring) ("To establish
uniform laws of bankruptcy does not mean wiping out the
differences among the forty-eight States in their laws governing
commercial transactions.").  Indeed, in areas of traditional
state regulation, "the Bankruptcy Code will be construed to
adopt, rather than to displace, pre-existing state law" unless
Congress's intent to the contrary is "'clear and manifest.'"  BFP

v. <u>Resolution Trust Corp.</u>, 511 U.S. 531, 544-45 (1994) (quoting <u>English</u> v. <u>General Elec. Co.</u>, 496 U.S. 72, 79 (1990)); <u>accord</u> <u>In re Bank of New England Corp.</u>, 364 F.3d 355, 363 (1st Cir. 2004) ("[B]ankruptcy courts should only modify the usual state-law compendium of [property] rights and remedies if and to the extent that such modifications are specifically authorized or directed by the Bankruptcy Code.").  Moreover, if a uniform federal standard is to be adopted, it is much more effective to do so through promulgation of rules by the Supreme Court or by Congress, than through a series of conflicting district court decisions that take years to converge on one standard through the process of appellate review.

Here, as in <u>BFP</u>, "an essential state interest is at issue." <u>BFP</u>, 511 U.S. at 544.  As the Supreme Court observed in <u>Leis</u> v. <u>Flynt</u>, 439 U.S. 438 (1979) (per curiam), "[s]ince the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions."  439 U.S. at 442; <u>In re Peterson</u>, 163 B.R. 665, 673 (Bankr. D. Conn. 1994) (citing <u>Leis</u>). In fact, the Supreme Court has "[o]n various occasions" characterized the states' interest in regulating the practice of law not only as traditional, but also as "substantial" or even "compelling."  <u>Florida Bar</u> v. <u>Went For It, Inc.</u>, 515 U.S. 618, 625 (1995) (citing <u>Edenfield</u> v. <u>Fane</u>, 507 U.S. 761, 769 (1993),

Goldfarb v. Virginia State Bar, 421 U.S. 773, 792 (1975),
Ohralik, 436 U.S. at 460, and Cohen v. Hurley, 366 U.S. 117, 124
(1961)).  It recognized in Goldfarb that within their boundaries,
"the States have a compelling interest in the practice of
professions" and an "especially great" interest in the practice
of law:[10] "[L]awyers are essential to the primary governmental
function of administering justice, and have historically been
'officers of the courts.'" Goldfarb, 421 U.S. at 792.  But as the
Sixth Circuit suggested in Desilets, these cases may be
distinguishable.  See Desilets, 291 F.3d at 929.  They recognized
merely that "state rules governed practice in state courts"; they
did not suggest that "state rules govern practice in federal
courts." Id. (citing Leis, 439 U.S. at 441-42).  While this

_____

[10] In Sperry, the Supreme Court noted that the states'
regulatory interests were safeguarded by the Patent Office's
"testing applicants for registration" and "insisting on the
maintenance of high standards of integrity." Sperry, 373 U.S. at
402.  In contrast to the Patent Office, the Bankruptcy Court
relies primarily on the admission requirements of the Supreme
Judicial Court of Massachusetts.  See Bankr. D. Mass. R. 9010-
1(a); D. Mass. R. 83.5.1(a)(1); see also Lyon, 301 Mass. at 35
(distinguishing the Massachusetts bar, which "maintain[s]
elaborate machinery for ascertaining the qualifications of
applicants for admission," from the federal bar, which "commonly
rel[ies] to a large extent upon the evidence of  qualification
furnished by admission to practice in the State").  Accordingly,
"unlike the patent law license involved in Sperry, admission to
practice in the bankruptcy court does not reflect a judgment by
any federal authority that an attorney is qualified to practice
bankruptcy law generally." Peterson, 163 B.R. at 674 n.7
(discussing the analogous requirements for admission to the bar
of the United States Bankruptcy Court for the District of
Connecticut).

Court does not disagree, it finds the cases nevertheless instructive.  The states' traditional interest in regulating lawyers is not relevant because state regulations govern, but because the federal regulations that do govern "cannot . . . be construed without regard to the implications of our dual system of government."  <u>BFP</u>, 511 U.S. at 544 (quoting Felix Frankfurter, <u>Some Reflections on the Reading of Statutes</u>, 47 Colum. L. Rev. 527, 539-40 (1947)).

In sum, Chimko has not demonstrated that the frustration of federal objectives is sufficiently likely, or that the need for uniformity is sufficiently strong to warrant a nationwide federal rule.  Absent such a demonstration, the Supreme Court has "indicated that federal courts should incorporate state law as the federal rule of decision."  <u>Kamen</u> v. <u>Kemper Fin. Servs., Inc.</u>, 500 U.S. 90, 98 (1991) (quoting <u>Kimbell Foods</u>, 440 U.S. at 728) (internal quotation marks and alterations omitted); <u>accord</u> <u>In re Calore Express Co.</u>  288 F.3d 22, 44 (1st Cir. 2002) ("[A] federal court applying federal common law will often simply incorporate the law of the appropriate state if there is no relevant federal interest to justify a distinct federal rule.").  This "presumption" favoring the incorporation of state law, <u>Kamen</u>, 500 U.S. at 98, is strengthened here by the "especially great" state interest in the regulation of lawyers, <u>Goldfarb</u>, 421 U.S. at 793.  Accordingly, the Court adopts Massachusetts

standards to define the "practice of law" limitation of Federal
Rule 9010(a).

Incorporating Massachusetts standards, however, does not
necessarily mean that Chimko has failed to comply with the
federal rule.  The rule permits Chimko to appear as (1) "an
attorney authorized to practice in the court," or as (2) "an
authorized agent" "perform[ing] any act not constituting the
practice of law."  Fed. R. Bankr. P. 9010(a).  Under the first
prong, Chimko's "authority to practice in the [bankruptcy] court"
rests primarily on fulfilling the requirements of the Supreme
Judicial Court of Massachusetts.  See Bankr. D. Mass. R.
9010-1(a); D. Mass. R. 83.5.1(a)(1).  The rules of the Supreme
Judicial Court, although distinct in certain "significant
respects," substantially parallel the American Bar Association's
("ABA's") Model Rules of Professional Conduct (the "Model
Rules").  See Chief Justice Herbert P. Wilkins, The New
Massachusetts Rules of Professional Conduct: An Overview, 82
Mass. L. Rev. 261, 261 (1997) (explaining that the Supreme
Judicial Court adopted the new Massachusetts Rules, effective
January 1, 1998, "within the framework of the American Bar
Association's Model Rules of Professional Conduct").
Massachusetts Rule 5.5, adopted in a form "[i]dentical to Model
Rule 5.5," provides that "[a] lawyer shall not (a) practice law
in a jurisdiction where doing so violates the regulation of the

legal profession in that jurisdiction." Mass. R. Prof. C. 5.5 &
cmt.

The parallel Model Rule, in contrast, has since been amended
to permit as well as prohibit certain forms of practice. See
American Bar Ass'n, Report of the Commission on
Multijurisdictional Practice, Introduction and Overview, at
http://www.abanet.org/cpr/mjp-home.html (Aug. 2002).
Specifically, in August 2002, in response to the changing "needs
of clients in a national and global economy," Model Rule 5.5 was
amended to permit specified aspects of "multijurisdictional"
practice -- that is, "legal work . . . in a jurisdiction in which
the lawyer is not admitted." Id. As amended, Model Rule 5.5
provides, in relevant part:

> A lawyer admitted in another United States
> jurisdiction, and not disbarred or suspended from
> practice in any jurisdiction, may provide legal
> services on a temporary basis in this jurisdiction
> that:
>
>                          . . .
>
>         (4) . . . arise out of or are reasonably related
>         to the lawyer's practice in a jurisdiction in
>         which the lawyer is admitted to practice.

Model Rules of Professional Conduct Rule 5.5(c). The amended
Model Rule, if adopted by the Supreme Judicial Court and read to
influence the related rules of the District Court and Bankruptcy
Court, arguably would authorize Chimko's actions here. Compare
7/31/03 Show Cause Hr'g Tr. at 22:13-14:10 (discussing Chimko's

nationwide "management work" performed on behalf of Household Finance), <u>with</u> Model Rules of Professional Conduct Rule 5.5 cmt. 14 (suggesting factors that would evidence the "relationship" necessary to authorize a lawyer's multijurisdictional practice: "[t]he lawyer's client may have been previously represented by the lawyer," "the client's activities or the legal issues [may] involve multiple jurisdictions," or "the services may draw on the lawyer's recognized expertise developed through the regular practice of law on behalf of clients in matters involving a particular body of federal, nationally-uniform, foreign, or international law"). Yet the long history of the present Massachusetts Rules, adopted only after "careful consideration of each ABA model rule with the view toward . . . adapt[ation] to Massachusetts needs and preferences," cautions this Court against predicting that the Supreme Judicial Court would apply amended Model Rule 5.5 in this, or indeed in any future, case.[11] Wilkins, <u>supra</u>, at 262. The Court thus turns to considering Chimko as both he and the Bankruptcy Court did, as an "agent" rather than "an attorney authorized to practice in the court."

---

[11] Although the Supreme Judicial Court might otherwise weigh the "merits of uniformity" in favor of adoption, the states remain in "considerable disagreement" regarding amended Model Rule 5.5. <u>See</u> Wilkins, <u>supra</u>, at 262; American Bar Ass'n, Chart on State Implementation of ABA Model Rule 5.5, <u>at</u> http://www.abanet.org/cpr/mjp-home.html (last updated Sept. 15, 2004).

Under the second prong of Federal Rule 9010(a), Chimko's
authority as an agent depends on whether his acts "constitut[e]
the practice of law." The approach of Massachusetts courts,
which this Court adopts for the reasons described above, has not
been "to frame any comprehensive . . . definition of what
constitutes the practice of law," but rather to decide each case
"upon its own particular facts." In re Shoe Mfrs. Protective
Ass'n, 295 Mass. 369, 372 (1936). In general, however, the
Supreme Judicial Court has said:

> [T]he practice of directing and managing the
> enforcement of legal claims and the establishment of
> the legal rights of others, where it is necessary to
> form and to act upon opinions as to what those rights
> are and as to the legal methods which must be adopted
> to enforce them, the practice of giving or furnishing
> legal advice as to such rights and methods and the
> practice, as an occupation, of drafting documents by
> which such rights are created, modified, surrendered or
> secured are all aspects of the practice of law.

Id. The Supreme Judicial Court determined that no exceptions to
that statement applied to the case before it, id., but
subsequently carved out one such exception for the preparation of
simple instruments. See Loeb, 315 Mass. at 185-86. In Loeb, the
Supreme Judicial Court described the "real" difference "between
the drafting of simple instruments and the drafting of complex
ones":

> There are instruments that no one but a well trained
> lawyer should ever undertake to draw. But there are
> others, common in the commercial world, and fraught
> with substantial legal consequences, that lawyers
> seldom are employed to draw, and that in the course of

recognized occupations other than the practice of law
are often drawn by laymen for other laymen . . . .

Id. at 186.  In this context, "[t]he actual practices of the
community have an important bearing on the scope of the practice
of law."  Id.

    With the aid of these general principles, the Court proceeds
to consider "particular facts."  The Bankruptcy Court determined
that "all of [Chimko's] actions" -- including preparing the
reaffirmation agreement, providing Lucas with the notice of
reaffirmation, and corresponding with Lucas and the Bankruptcy
Court -- "constitute the practice of law."  Mem. of Decision at
3.  This Court considers the actions in turn.

    As to the reaffirmation agreement, the Bankruptcy Court
stated simply that it "modified and created" contractual rights.
Id.  This Court does not disagree.  Yet it "cannot be maintained"
that Chimko, merely by "draft[ing] for another some document that
has legal effect," was necessarily practicing law.  See Loeb, 315
Mass. at 181.  Rather, as the Supreme Judicial Court has
recognized, the preparation of certain simple instruments may
"lie in a penumbra" rather than "wholly within the practice of
law."  Id. at 183.  Like the income tax returns at issue in Loeb,
the reaffirmation agreement was prepared using a "blank form[],"
id. at 185 (specifically, a version of Official Bankruptcy Form
6, with modifications approved by Household Finance).  See
7/31/03 Show Cause Hr'g Tr. at 15:11-18; 37:3-38:13.  And

although the completion of bankruptcy forms often requires legal expertise -- where, for example, the printed instructions require legal interpretation, see Taub v. Weber, 366 F.3d 966, 971 (9th Cir. 2004), or the terms of the agreement must be negotiated, see In re Carlos, 227 B.R. 535, 536 (Bankr. C.D. Cal. 1998) -- this apparently was not the case here.  Consistent with his practice, Chimko completed the reaffirmation agreement with the original terms of the mortgage; he made no changes and conducted no negotiations.  See Appellant's Br. at 22; 7/31/03 Show Cause Hr'g Tr. at 15:7-8; 40:2-8; 42:14-43:17.  In addition, while it may sometimes require legal skill to determine whether a particular legal form will achieve a desired result, see, e.g., State v. Buyers Serv. Co., Inc., 292 S.C. 426, 430 (1987), here the form itself disclosed its effect.  See Official Bankruptcy Form 6 ("NOTICE TO DEBTOR: This agreement gives up the protection of your bankruptcy discharge for this debt.").  For these reasons, Chimko's involvement in preparing the reaffirmation agreement seems closer to permissible "scrivening" or "typing" than impermissible legal drafting.  See Mason, 46 F.3d at 470, 472 (characterizing the activities of a bankruptcy service, which included "fill[ing] in appropriate blanks on a reaffirmation form," as "administrative functions that can be performed by authorized nonlawyer agents"); see also Taub, 366 F.3d at 969, 971 (distinguishing a lawyer, who assists the customer who "'does

35

not know what forms to use or how to direct their completion,'"
from a scrivener, who assists the customer who "'does know what
he wants and how he wants it done'" (quoting <u>Oregon State Bar</u> v.
<u>Security Escrows, Inc.</u>, 233 Or. 80, 93 (1962))); <u>but see</u> <u>In re</u>
<u>van Dyke</u>, 296 B.R. 591, 594 (Bankr. D. Mass. 2003) (recognizing
the "'split of authority [over] whether preparation of preprinted
legal forms constitutes unauthorized practice of law'" and
observing that "[i]n Massachusetts the issue has not be squarely
addressed" (<u>quoting</u> <u>In re Ellingson</u>, 230 B.R. 426, 433 (Bankr. D.
Mont. 1999)).

Not all of the facts, however, point in the same direction.
First, Chimko is a lawyer, not a layman.  The bankruptcy court in
<u>Carlos</u> suggested that the situation is therefore "different":
"Where a client hires an attorney . . . . [t]he client expects
and is entitled to the expertise of an attorney . . . ."  <u>Carlos</u>,
227 B.R. at 538-39.  In this regard, the Court notes that while
Chimko denied playing the lawyer's "full consultation role" in
jurisdictions other than Michigan, he did "keep a record" of each
district's local requirements for the benefit of his client.  <u>See</u>
7/31/03 Show Cause Hr'g Tr. at 15:1-4; 48:16-21.  Second, the
Trustee's account of commercial practice, though admittedly
anecdotal, suggests that reaffirmation agreements are commonly
prepared by local rather than national counsel.  <u>Id.</u> at 33:11-16;
59:2-6.  The "actual practices of the community," then, may place

36

Chimko's actions within "the scope of the practice of law." See
Loeb, 315 Mass. at 186; cf. Johnson v. Avery, 393 U.S. 483, 490
n.11 (1969) (suggesting that the "power of the States to control
the practice of law" does not extend to the preparation of habeas
corpus petitions in part because the function is "often, perhaps
generally, performed by laymen").  Thus, while the Court
considers Chimko's preparation of the reaffirmation agreement to
be an "act not constituting the practice of law," it acknowledges
that under Massachusetts law, the question is not entirely free
from doubt.

     With regard to the notice of reaffirmation, the Bankruptcy
Court observed that Chimko "believed [it] would be of assistance
to [pro se debtors] in understanding the reaffirmation process."
Mem. of Decision at 3.  Providing such assistance, the Bankruptcy
Court concluded, constituted the "practice of law."  Id.  Chimko
urges this Court to credit his contrary testimony that he
intended merely to ensure "that a hearing would be scheduled" and
"that he would be served notice as agent for Household."
Appellant's Br. at 24.  Under the prescribed standard of review,
however, "due regard shall be given to the opportunity of the
bankruptcy court to judge the credibility of the witnesses."
Fed. R. Bankr. P. 8013.  What is more, even absent such regard,
the Court would note that Chimko's testimony was inconsistent
with his actions.  Chimko argued before the Bankruptcy Court that

the "real thrust of the notice" was a request for service, 7/31/03 Show Cause Hr'g Tr. at 5:20-25, the filing of which does not require leave to appear, <u>see</u> Bankr. D. Mass. R. 9010-1(d); Appellant's Br. at 23-24.  Yet as the Bankruptcy Court noted, and as Chimko conceded, the notice was "captioned as a pleading," 7/31/03 Show Cause Hr'g Tr. at 5:16-20, the signing and filing of which typically does require leave to appear, <u>see</u> Bankr. D. Mass. R. 9010-1(b), 9011-1.  More importantly, although Chimko purported merely to request action of the Bankruptcy Court, he also provided the notice to Lucas.  The combined effect of Chimko's actions was, in the estimation of the Bankruptcy Court, to present the notice as a formal "attorney's statement" of some significance to the pro se debtor.  <u>See</u> Mem. of Decision at 5-6; <u>see also</u> <u>Massachusetts Conveyancers Ass'n</u> v. <u>Colonial Title & Escrow</u>, Civ. A. No. 96-2746-C, 13 Mass. L. Rptr. 633, 2001 WL 669280, at *6 (Mass. Super. Ct. June 5, 2001) (explaining that the "practice of law includes the rendering of legal opinions in circumstances where an individual [there, inexperienced and sometimes financially desperate borrowers] will rely on that opinion").

That said, the finding that Chimko intended the notice to "be of assistance" does not necessarily suggest that he was engaged in the practice of law.  Indeed, the ethical considerations of the ABA's Model Code, which the Supreme

Judicial Court previously regarded as "a guiding principle," In re Fordham, 423 Mass. 481, 491 (1996),[12] may suggest otherwise. Ethical Consideration 3-5 limits the activities that constitute the "practice of law" to services requiring the "professional judgment of a lawyer" -- that is, "his educated ability to relate the general body and philosophy of law to a specific legal problem."  Model Code of Professional Responsibility EC 3-5; see also, e.g., Oregon State Bar v. Smith, 149 Or. App. 171, 183 (1997) ("[T]he 'practice of law' means the exercise of professional judgment in applying legal principles to address another person's individualized needs through analysis, advice, or other assistance.").  Significantly, then, Chimko's notice was essentially generic.[13]  See 1 Appellant's App. at A038.  Chimko

_____

[12] Because the Supreme Judicial Court has since replaced the Commonwealth's Code of Professional Responsibility, see Wilkins, supra, at 261, its continued reliance on the ABA's ethical considerations is uncertain.

[13] The Court acknowledges that Chimko's assistance, even if generic, might be considered an exercise of legal discretion, "'an intelligent choice between alternative methods.'"  See Taub, 366 F.3d at 969 (quoting Security Escrows, Inc., 233 Or. at 91). Lucas, who had stated his intent to retain his home despite various creditors' apparently unavoidable security interests in that home, Appellant's App. at A026, had two options for doing so: redeem the property or reaffirm the debt secured by the property.  See 11 U.S.C. § 521(2)(A); In re Burr, 160 F.3d 843, 848-49 (1st Cir. 1998) (rejecting a third alternative, endorsed by some courts, known as "retention" or "ride-through," wherein a debtor simply continues to make scheduled payments under a loan agreement, without reaffirming or redeeming).  Chimko provided assistance regarding reaffirmation only, with no discussion of redemption.  "[A]s a practical matter," though, debtors such as Lucas generally are not free to choose among methods; more often

testified that it was used "[i]n every pro se case" and had been
revised to comply with the local laws of every jurisdiction.
7/31/03 Show Cause Hr'g Tr. at 18:5-7, 26:9-27:9.  Similarly, the
Bankruptcy Court noted Chimko's "repeated" failure to modify the
notice from the form he typically used in Michigan.  Mem. of
Decision at 5.  For these reasons, although the policy of the
Supreme Judicial Court is again not entirely clear, the Court
concludes that Chimko's preparation of the notice did not
constitute the practice of law because the "assistance" he
provided did not relate to any specific legal problem.  See
ABA/BNA Lawyers' Manual on Professional Conduct, supra, 21:8023
("In general, the dissemination of legal information . . . does
not constitute the practice of law, provided the information is
geared to the general public and does not involve the provision
of individualized advice or legal services to clients.").

     Turning finally to Chimko's correspondence, the Bankruptcy
Court stated only that the letters, each printed on the
letterhead of Chimko's law firm, were "includ[ed]" among the
actions constituting the practice of law.  See Mem. of Decision
at 3.  Above, this Court described the use of letterhead as
"itself a communication."  See supra section III(C) (citing,

_____

they are "compelled [by financial considerations] to enter into
reaffirmation agreements with their secured creditors."  Burr,
160 F.3d at 849.  An individual in bankruptcy will rarely have
sufficient funds to redeem collateral.

inter alia, Mem. of Decision at 5, and Mass. R. Prof. C. 7.5).

Other courts have more specifically recognized that a party who

uses legal letterhead "h[o]ld[s] himself out to be an attorney

authorized to practice law." Board of Overseers of the Bar v.

MacKerron, 581 A.2d 424, 425 (Me. 1990); accord The Florida Bar

v. Breed, 368 So. 2d 356, 357 (Fla. 1979); see also In re Finn,

433 Mass. 418, 420-21 (2001).  Here, although he purported to act

as an agent only, Chimko conducted correspondence on the

letterhead of "SHERMETA, CHIMKO & ADAMS P.C. / Attorneys and

Counselors at Law."  Mem. of Decision at 3.  Chimko thus

suggested that he was acting as an attorney, id., a suggestion

that the Supreme Judicial Court has noted may independently

constitute the unauthorized practice of law, see In re McInerney,

389 Mass. 528, 536 n.11 (1983) ("We note that the decisions from

other jurisdictions hold 'that unauthorized practice of law

includes the mere holding out by a disbarred attorney that he is

practicing or is entitled to practice law.'"  (quoting In re

Peterson, 274 N.W.2d 922, 926 (Minn. 1979))).  See also Lindsey

v. Ogden, 10 Mass. App. Ct. 142, 149-50 (1980) (characterizing an

assertion of unauthorized practice as "frivolous" when the

attorney "never held himself out as a Massachusetts lawyer . . .

and never did anything else that could be considered as the

practice of law in this State"); cf. Mass. Gen. Laws ch. 221, §

41 (including "[w]hoever . . . represents himself to be an

41

attorney or counsellor at law . . . by means of a sign, business card, letter head or otherwise" among those who may be criminally punished for the unauthorized practice of law).

Yet in McInerney, the Supreme Judicial Court also determined that the respondent, who had been suspended from the practice of law, "intended to hold himself out as a practicing attorney by listing himself as an attorney in the [telephone] directory." McInerney, 389 Mass. at 536. Here, the Bankruptcy Court acknowledged that "Chimko might have not intentionally held himself out to be anything other than an agent."[14] Mem. of Decision at 6; see also 7/31/03 Show Cause Hr'g Tr. at 52:8-10 (THE COURT: "I think you're practicing law at every state in the country that you file these in, and I don't think you know it yet."). But see 7/31/03 Show Cause Hr'g Tr. at 55:24-56:1 ("[H]e's seeking to make a distinction because, in my judgment, because they know that they shouldn't be holding themselves out as an attorney in Massachusetts."). In contrast to McInerny, then, the evidence of intent is far from "extensive." McInerney, 389 Mass. at 536. Ultimately -- absent contrary guidance from

_____

[14] The Bankruptcy Court stated an apparently contrary conclusion in response to Chimko's motion for consideration, see Order of 10/31/03, at ¶ 3, but the context of the statement suggests that it was intended only to confirm the prior decision. See id. ("[H]is compliance or non-compliance with the Court's Order is not material to the Court's conclusion that he held himself out as an attorney without being licensed by the Commonwealth and fails to alter the outcome of the Court's Order on Decision with Respect to the Court's Order to Show Cause.").

the courts of the Commonwealth -- it appears to this Court that the evidence before it insufficient to warrant the conclusion that Chimko held himself out as a practicing attorney and thus subjected himself to the potentially serious consequences that attend the unauthorized practice of law. See <u>Attorney Grievance Comm'n of Md.</u> v. <u>Shaw</u>, 354 Md. 636, 652 (1999) (concluding that the "respondent's use of the term 'Esq.' in correspondence" "provide[d] an insufficient basis for the finding that the respondent held herself out as a lawyer").

In sum, it does not appear to this Court that Chimko's actions constituted the "practice of law" as defined by Massachusetts law and incorporated by Federal Rule 9010(a). The Court recognizes, however, that the question is largely one of policy, or, as the ABA described it, one of "balance" -- "between the interests of a state in protecting its residents and justice system, on the one hand," and, on the other hand, "the interests of clients in a national and international economy in the ability to employ or retain counsel of choice efficiently and economically." See Commission on Multijurisdictional Practice, <u>supra</u>. Moreover, although the Supreme Judicial Court has stated that the "practice of law" must, "[t]o a large extent," be defined in light of "particular facts," <u>Shoe</u>, 295 Mass. at 372, facts like those presented here are certain to recur with increasing frequency, with significant effects not only for

43

debtors, creditors, and their counsel, see Appellant's Supp. Br.
[Doc. No. 10] at 8; C.R. "Chip" Bowles, But It Says on My Card .
. . Unauthorized-Practice-of-Law Issues in Bankruptcy, Am. Bankr.
Inst. J., Mar. 2001, at 24, but also for clients and attorneys
generally. See Charles W. Wolfram, Sneaking Around in the Legal
Profession: Interjurisdictional Unauthorized Practice by
Transactional Lawyers, 36 S. Tex. L. Rev. 665 (1995); Ethics
Northwest, Inc., CrossingtheBar.Com: Information and Commentary
on the Multijurisdictional Practice of Law, at
http://www.crossingthebar.com (last edited September 11, 2004).
In light of the compelling nature of the Commonwealth's
interests, the recognized significance of the issue, and the
apparent lack of controlling precedent, the Court respectfully
certifies the attached questions to the Supreme Judicial Court.[15]
See Sup. Jud. Ct. R. 1:03.

**IV.  CONCLUSION**

Accordingly, the Order of the Bankruptcy Court is AFFIRMED
as to its conclusion that Chimko's communications were misleading
under the Massachusetts Rules of Professional Conduct.  Although

---

[15] The Court acknowledges that commentators have urged
caution both in certifying and receiving questions, see, e.g.,
Hon. Bruce M. Selya, Certified Madness: Ask a Silly Question, 29
Suffolk U. L. Rev. 677, 691 (1995); The Overworked Certification
Procedure?, N.Y. St. L. Dig., Apr. 2004, at 1-2, and has
exercised such caution here.  The Court concludes, after careful
consideration, that certification in this instance truly "helps
build a cooperative judicial federalism."  Lehman Bros. v.
Schein, 416 U.S. 386, 391 (1974).

the Court is inclined to reverse the Bankruptcy Court's conclusion that Chimko's actions constituted the unauthorized practice of law, because the latter issue is not clearly resolved by controlling precedent, the Court respectfully CERTIFIES the attached questions to the Supreme Judicial Court.  Pending the receipt of an opinion from the Supreme Judicial Court, this matter is administratively closed.

SO ORDERED.

/s/ William G. Young
WILLIAM G. YOUNG
CHIEF JUDGE

<u>CERTIFICATION</u>

For the reasons discussed in the attached Memorandum & Order, the resolution of a determinative issue depends on questions of Massachusetts law for which there are no clearly controlling precedents in the decisions of the Supreme Judicial Court of Massachusetts. Accordingly, this Court respectfully certifies the following questions to the Supreme Judicial Court of Massachusetts pursuant to its Rule 1:03:

1.  Does an attorney admitted to practice in another United States jurisdiction but not admitted to practice in the Commonwealth of Massachusetts engage in the "practice of law" by:

    a.  completing a reaffirmation form that modifies and creates rights but does not change the original terms of the loan;

    b.  providing a pro se debtor with a notice intended to provide general assistance in understanding the reaffirmation process; and

    c.  corresponding with a pro se debtor and the Bankruptcy Court using law firm letterhead but not clearly intending to hold himself out as practicing law?

2.  If the above constitutes the "practice of law," may such services be provided on a temporary basis in the Commonwealth of Massachusetts if they are reasonably related to the attorney's practice in the other jurisdiction?

The Court of course welcomes the advice of the Supreme Judicial Court of Massachusetts on any other questions of Massachusetts law deemed material to this case.

The Clerk will transmit these questions, the Court's Memorandum & Opinion, and copies of the Record, briefs, and appendices in this case to the Supreme Judicial Court of Massachusetts.

46